UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 25-347 (KES/VLD)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **TRIAL BRIEF OF THE UNITED** |
| | ) | **STATES** |
| ROBERT PHILLIP IVERS, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys, Daniel N. Rosen, United States Attorney for the District of Minnesota, and Bradley M. Endicott and William C. Mattessich, Assistant United States Attorneys, respectfully submits its trial brief in the above-captioned case. This memorandum includes a summary of the facts the government expects the evidence will establish at trial along with summaries of the government's motions in limine and other potential evidentiary matters.

## I.   Superseding Indictment and Elements of the Offense

The Defendant is charged with three counts: Counts One and Two charge Mailing a Threat to Injure the Person of Another, in violation of 18 U.S.C. § 875(c).  There are three elements of the offense, which are: (1) the defendant knowingly mailed (or caused to be delivered by the Postal Service according to the directions thereon) a communication addressed to any other person; (2) the communication contained a threat to kidnap or to injure a person; and (3) the defendant subjectively intended the communication as a threat, or knew the communication would be viewed as a threat, or consciously disregarded a substantial risk that the communication would be viewed as threat. Count Three charges

1

Threatening to Murder a United States Judge, in violation of 18 U.S.C. § 115(a)(1)(B). That offense has two elements: (1) the defendant made a threat to murder a United States Judge; and (2) the defendant did so with the intent to impede, intimidate, and interfere with the Judge while such Judge was engaged in the performance of the Judge's official duties, or to retaliate against such Judge on account of the performance of the Judge's official duties.

## II.    Anticipated Length of Trial

The United States anticipates that the trial, including jury selection and the charge, will require three days.

## III.    Background and Anticipated Trial Evidence

At trial, the government will present evidence of Ivers's threatening 2025 mailings that are the subjects of Counts 1-3. In order to provide the context for those statements—which the government must do to prove Ivers's intent and knowledge—the government will also present limited evidence of Ivers's previous interactions with Judge W.M.W., Judge A, defense attorney A.T., and United States Probation & Pretrial Services officers. The government will also provide the jury with Ivers's letters to the Court from this case and his previous cases.

### A.  Ivers Threatens Judge W.M.W. During his Civil Lawsuit

Defendant Ivers was convicted after he threatened the life of United States District Judge W.M.W, who presided over a civil lawsuit he filed in the District of Minnesota in 2015. *See Ivers v. CMFG Life Ins. Co.*, No. 15-1577 (WMW/BRT). During the pendency of the civil lawsuit, Ivers frequently erupted into frightening outbursts directed at district

court staff and Judge W.M.W. This included threatening letters to the court with statements such as "I am sick and tired of this fucking bullshit!"; "I want my fucking money. . ."; "I will not negotiate!"; "I am in dire fucking straits!"; and "I am becoming a very dangerous person!" Ivers persisted in this behavior, despite multiple warnings from the United States Marshals Service to stop.

In 2017, Ivers lost the civil lawsuit after a bench trial. Ivers continued to make aggressive statements toward Judge W.M.W. On September 1, 2017, Deputy Marshals Farris Wooten ("Wooten") and Jeff Hattervig ("Hattervig") went to Ivers's residence to attempt to dissuade Ivers from making threatening statements. Ivers insisted that Judge W.M.W. had "screwed me out of $100,000" and when told that his statements were making others scared, Ivers replied, "that fucking judge—you know if she's scared and she's fearful, it's not my problem. She made her bed."

Rather than accept Judge W.M.W.'s findings, Ivers filed the same substantive lawsuit a second time, which was assigned to a different district court judge. *See Ivers v. CMFG Life Ins. Co.,* No. 17-5068 (PJS/DTS). He filed this lawsuit as a pro se litigant. The district court ordered Ivers to consult with two pro bono attorneys in Minneapolis. These two pro bono attorneys were A.T.—who is the victim referenced in Counts 2 and 3 of the Superseding Indictment—and L.F., both attorneys of Fredriksen & Byron, P.A., ("Fredriksen"). The attorneys reviewed Mr. Ivers's filings in his new case, along with filings and orders from the first lawsuit. The attorneys scheduled a call with Ivers to conduct an initial consultation on his case.

In February 2018, on the phone call with A.T. and the other attorney, Ivers conveyed threats to Judge W.M.W. The threats came in the context of the attorneys' discussion with Ivers about the merits of his claim. During the conversation, the attorneys told Ivers that his second lawsuit was unlikely to be successful. As part of the conversation, A.T. and L.F. discussed Judge W.M.W.'s previous ruling. At that point, Ivers became enraged, screaming that "this fucking judge stole my life from me," and words to the effect of "you don't know the 50 different ways I planned to kill her." The threats were reported to law enforcement.

As a result of this conduct, Ivers was indicted for threatening to kill Judge W.M.W. and for interstate transmission of a threat to injure the person of another. *See United States v. Ivers,* Case No. 18-cr-90 (JMM) Dkt. 1. At the outset of the case, all District of Minnesota judges were disqualified from presiding over Mr. Ivers's criminal case. *Id.* at Dkt. 6. The case was assigned to Judge A, who was a Senior Judge of the Southern District of Iowa.[1]

During the trial, A.T. testified about Ivers's statements on the telephone consultation. Case No. 18-cr-90 (JMM) Dkt. 157 (Tr.) at 454. A.T. testified that, after discussing the substance of his new case, the conversation turned to Judge W.M.W. Ivers told her "that fucking judge stole my life from me" and said "you don't know the 50 different ways I planned to kill her" or possibly "the 50 different ways I thought of killing her." (*Id.*) A.T. testified that these statements frightened her.

---

[1] Judge A took inactive status on September 1, 2023, at which point the criminal case was assigned to Judge James M. Moody. *See* Case No.18-cr-90 (JMM) Dkt No. 453. Judge A remained a Senior United States District Court Judge until his death on January 28, 2026.

At trial, Ivers moved to exclude these statements on the grounds that the statements were covered by attorney-client privilege. Judge A denied the motion and allowed the jury to hear the statements. The jury convicted Ivers after a four-day trial.

### B. The Court Sentences Ivers to 18 Months' Incarceration with Three Years' Supervised Release

In March 2019, Judge A sentenced Ivers to an 18-month sentence of imprisonment followed by three years of supervised release for his threats to kill Judge Wright. Case No. 18-cr-90 (JMM) Dkt. 174 at 2-3. His conditions of supervised release included a requirement that he participate in mental health treatment/anger management and that he wear a location monitoring bracelet. Approximately one month before his release from prison, Ivers demanded that he be released to North Dakota. The Court granted this request.

### C. Threat to a United States Probation Officer

In November 2022, after a period of incarceration following several violations of his supervised release conditions, Ivers was again released from federal custody and placed on supervised release. During the process of being released from custody, Ivers met with two U.S. Probation Officers in their office located in the Minneapolis Federal Courthouse. During that meeting, the officers explained the conditions of release to Ivers and fit him for the GPS bracelet.  The officers stated that Ivers became agitated during this meeting, yelling and swearing about the conditions of his release. He resisted efforts to calm him down. Court Security Officers and United States Marshals quickly responded and observed this behavior.

As Ivers left the probation office, he saw a probation officer standing in the hallway of the U.S. Probation Office.  Ivers walked past the officer, displayed both of his middle fingers to the officer and screamed, "Fuck you!"  Ivers then circled back, approached the officer a second time, and within a few feet of his face, yelled, "I'm going to get some fucking n****** to fucking kill you!" Ivers continued to yell the word "hate" as U.S. Marshals escorted him out of the probation office.

Following indictment for this conduct, Ivers wrote to numerous parties about the allegations.  One letter in particular was addressed to U.S. Probation Officer Trista Buttera. In the letter, Ivers threatened "walk back your bullshit complaint or you'll pay a heavy price!"

### D.  The Instant Offense: Ivers's Threatening Mailings in 2025

The Superseding Indictment includes three counts that address two threatening mailings. First, Counts 2 and 3 charge Ivers for a mailing that was sent on or about February 12, 2025, to Fredriksen & Byron, P.A. ("Fredriksen"), a law firm, at the firm's main office in Minneapolis. This mailing contained statements that threatened harm to Judge A, federal judges, A.T., and A.T.'s family. Second, Count 1 charges Ivers for a mailing that was sent on or about April 7, 2025, to University of Saint Thomas Vice President E. R. This mailing also contained statements that threatened federal judges and their families. Finally, the government will present testimony and evidence from Ivers's September 2025 arrest in

Wayzata following his conduct at the Wayzata Public Library. This will include evidence found in his car and statements he made during a Mirandized interview.

### i. February 2025: Mailing to Fredriksen and Byron

On February 12, 2025, Fredriksen received an envelope at its main office in Minneapolis containing Ivers's manuscript "How to Kill a Federal Judge." The manuscript was sent via United States Postal Service ("U.S.P.S.") Priority Mail and included a return address from Kelley, Wolter, & Scott, P.A. ("Kelley Wolter"), Mr. Ivers's counsel in his criminal case. U.S.P.S. records showed that the package was sent from West Fargo, North Dakota.

The package was scanned and photographed at Fredriksen, where mailroom staff emailed the firm's lawyers seeking the intended recipient of the "mystery package." One lawyer, who had ongoing litigation with Kelley Wolter, mistakenly assumed the package was related to his litigation. He opened the package and immediately forwarded it to the firm's general counsel, L.H. L.H observed the mailing's references to A.T. and to another attorney—who had already left the firm—who had worked on Ivers's pro bono case.

L.H. contacted A.T. to advise her of the disturbing nature of the mailing. A.T. remembered Ivers's initial case, her testimony at his criminal trial, and her experiences interacting with Ivers. Based on that background and the contents of the mailing, A.T. was frightened and concerned for her own safety and the safety of her family. At the time, A.T. did not know where Ivers lived or if he was in prison or under supervision. A.T. left the office to take her children home early from their school in order to ensure their safety.

7

Fredriksen arranged for security at A.T.'s house and for additional security at the Fredriksen office.

The package contained a manuscript with a cover page styled as a book titled "How to Kill a Federal Judge" signed "By Robert Ivers."



Gov. Ex. 1, at 1.

The manuscript included several dozen pages that included drawings, statements signed by Ivers, and excerpts from filings in his previous criminal and civil cases.

The book also included a page with text describing his "book" as "a deadly assassination guide designed on how to train, plan, hunt, stalk and kill anyone anywhere." Gov Ex. 1, at 6. The page stated that Ivers was "fueled with hate for having been tried and convicted in a federal court based on a fabricated lie told by his two sinister attorneys." *Id.* He further wrote that "an outraged Ivers is demanding his conviction be overturned – drenched in venom and covered in blood Ivers shakes the walls of Hell by threatening to

8

publish his blood soaked killing guide if his conviction remains intact." *Id.*  The pages contained violent language directed in the second person, interspersed with references to Ivers's anger at his lawyers—including specifically the names of A.T. and her former colleague—and Ivers's anger at the judge who convicted him. The manuscript also contained many threats to "federal judges" in general. Interspersed with written threats and descriptions of killing, the manuscript included darkly drawn photographs of angry faces, weapons, and purported "killers."



Gov. Ex. 1, at 23.

A.T. felt personally targeted by the passages referring to her as a "bimbo," as a "sinister attorney," and as a "femme fatale" who "falsely convicted" Ivers. Ivers's manuscript included a statement about his "lying attorneys":

> I am Robert Ivers, the author of this book. I was conspired against, then tried and falsely convicted by the testimony of my two lying attorneys, Lora Friedemann and Anne Rondoni Tavernier. They intentionally fabricated a false allegation against me, claiming I made an unproven death threat against a corrupt federal judge in Saint

Gov Ex. 2, at 8. Ivers's manuscript included a "chapter" titled "Flawed testimonies" that outlined his belief that A.T.—whom he described as an "airhead bimbo"—provided false and inconsistent testimony about his threat to kill Judge Wright. Gov Ex. 2, at 10-11. The manuscript also included excerpts from transcripts and trial orders that reproduced or referenced A.T.'s testimony from Ivers's trial. He added notes expressing his anger at A.T. and referencing A.T.'s child. He frequently referred to A.T. as a "bimbo" and wrote insults in the margins of the manuscript:



Gov. Ex. 2, at 17. He also alleged that A.T. had a personal relationship with Judge Wright. Gov. Ex. 2, at 18-19.

These expressions of anger at A.T. in the manuscript were accompanied, on different pages, by explicit violent threats phrased in the second person. The threats that caused A.T. the most concern were threats that included promises of harm to children or family. One page of the manuscript underlined A.T.'s name and included the statement "everyday I pray for the death of your child cunt!":



Gov. Ex. 2, at 22.  Throughout the manuscript, Ivers wrote other threats that refer to killing the reader's children.





 

Gov. Ex. 2, at 5, 15, 24, 26.

In the manuscript, Ivers also used vulgar, expletive-laden language to threaten federal judges. The pages contained explicit promises that the author or others affiliated with him would kill the reader, whom Ivers sometimes addressed as "judge."

 

Gov. Ex. 1, at 13, 16.

The manuscript phrased itself as a "how-to" guide on some pages and conveyed direct threats on others.

### ii.  April 7, 2025: Mailing to University of Saint Thomas

On April 7, 2025, the University of St. Thomas, in Saint Paul, Minnesota, received a package addressed to E.R., who was an administrator at the school. After reviewing the contents, St. Thomas security called the Saint Paul Police Department to report the mailing as a threat. Officer Mikali Talbot responded. Talbot encountered a manuscript to the one that was sent to Fredriksen. At trial, the government will show that the St. Thomas manuscript contained a number of pages that were identical to the Fredriksen manuscript. The Saint Paul Police later provided this information to federal law enforcement.

### iii.   September 5, 2025: Arrest at the Wayzata Public Library

In early September 2025, Ivers used a copy machine at the Hennepin County Public Library, Wayzata Branch, to print copies of his manuscript. When he ran out of funds to continue printing, he asked a librarian to help him. The librarian saw the front page titled "How to Kill a Federal Judge." As the librarian continued to interact with Ivers, Ivers opened the manuscript and showed it to her. The librarian saw a picture of a machine gun and a reference to killing children. Disturbed, the librarian spoke about the manuscript at the main desk with her co-worker. Ivers appeared to approach her in order to listen in on her conversation. The librarian noted Ivers's behavior as "creepy" and logged the interaction on the library's internal messaging system.

Ivers left three pages of the manuscript at the library. This included a page identifying the document as a "five star blood soaked killing guide" in which "Mr. Ivers Exacts a Violent Revenge." When the librarians found this manuscript, library staff reported Ivers to the police.



Gov. Ex. 33.

The Wayzata Police identified Ivers as a public safety threat and searched for him. They found his car and pulled him over in Wayzata, where they arrested Ivers. Ivers then claimed he was having a heart attack, which led the officers to transport him to the hospital. The officers impounded Ivers's car and obtained a search warrant for the car. The next day, officers searched Ivers's car. Inside the car, the police found a manuscript of "How to Kill a Federal Judge," among other items. Wayzata Police placed Ivers under arrest for Threats of Violence.

Wayzata Police Detective Sergeant Dan Lee interviewed Ivers about the manuscript. Ivers behaved aggressively, insulting Lee and referring to the Wayzata librarian as a "cunt." Ivers repeatedly told Lee that the police didn't have any evidence and that Ivers had not broken the law. Ivers said that he was printing a "promo for a book" at the Wayzata Public Library. He said that he sent the "book" to Fredriksen, Judge A, and "all nine Supreme Court Justices." He emphatically insisted that his "book" was no different than any work of fiction which contained a story about killing an official. He described his process of sending the book to people as "vetting" of the book. Ivers was booked at the Hennepin County Jail

IV.    **Evidentiary Issues**

A.  **Intrinsic Evidence and 404(b) Evidence (MIL #1)**

As discussed above, this case involves years of history between the Defendant and the federal court system. The government intends to offer, in its case-and-chief, both intrinsic evidence and Federal Rule 404(b) evidence that describes this history. The

government has filed a separate motion and accompanying memorandum regarding the admissibility of this evidence.

### B.  The Defendant's Out of Court Statements (MIL #2)

At trial, the government intends to offer out-of-court statements made by Ivers to other witnesses, sent through mailings to Fredriksen and Saint Thomas, and sent through letters on the court docket. To the extent that such statements are offered to prove the truth of the matter asserted, they are statements of a party opponent.  Fed. R. Evid. 801(d)(2)(a). While Rule 801 permits the government to present these statements, Rules 801(c) and 802 prohibit the admission of an out-of-court statement, offered to prove the truth of the matter asserted, when offered by the party uttering the statement. *United States v. Hughes*, 535 F.3d 880, 882 (8th Cir. 2008) (self-serving statement of defendant not admissible as statement against interest or under residual hearsay exception). Therefore, the government requests that the Court order that Ivers not offer or reference his own hearsay statements at trial, either during cross-examination or during his case-in-chief.  Further argument is contained in Motion in Limine #2.

### C.  Mention of Potential Punishment or the Effects of Potential Punishment (MIL #2)

The government moves to preclude Ivers or his counsel from making any reference to the potential punishment he might face if convicted or the effect that punishment may have on his physical person. There is a heightened reason for concern because during the last trial before this Court, Ivers testified and, in the presence of the jury, repeatedly stated

he was "facing 15 years in prison." This testimony caused the Court to give a curative instruction to the jury prior to deliberation.

During Court appearances for this case, Mr. Ivers has continued to reference his incarceration. At both status conferences following the Superseding Indictment, Ivers loudly complained about being detained. Furthermore, his manuscript includes (sometimes false) statements about how much time he served or could have served in prison. If Ivers testifies, he will almost certainly make the same argument.

The punishment attributable to an offense is irrelevant to the elements of the offense and does not have any bearing on whether the government has proven the case beyond a reasonable doubt. Therefore, such evidence is neither relevant nor admissible pursuant to Federal Rules of Evidence 401 and 402 and Ivers should be instructed not to comment on it to the jury.  This argument is also contained in the government's Motion in Limine #2.

### D.  Hybrid Pro Se Representation (MIL #3)

The defendant has filed documents indicating his intent to proceed as "pro se co-counsel." *See, e.g.*, Dkts. 87, 90, 89-94, 97-98, 100-02. He may not be allowed do so. The government's Motion in Limine #3 more fully addresses the defendant's constitutional right to counsel.

### E.  Testimony from Ivers's Former Attorney

Ivers has informed the government that he intends to call his former attorney, Brett Kelley, as a witness. According to Ivers's current defense counsel, Kelley's testimony "will relate to Mr. Kelley's preindictment communications with Ivers concerning the defendant's purpose and intent in drafting and distributing the manuscript entitled 'How to

17

Kill a Federal Judge,'" and will also discuss "preindictment communications with Ivers and third parties regarding the manuscript." Without a more detailed offer of proof, the government is not able to file a motion in limine regarding Kelley's testimony.

To the extent Kelley would recount what the defendant told him about his purpose or intent in sending the manuscript, that testimony is hearsay. Rule 801(d)(2) does not permit the defendant to introduce his own out-of-court statements through another witness. Moreover, Kelley should not be permitted to testify to the defendant's then-existing state of mind regarding the mailings with a self-serving retrospective explanation. *See* Fed. R. Evid. 803(3). The hearsay restriction also applies to statements made by third parties, including victims or law enforcement witnesses, that Kelley would recount on the stand.

Kelley's testimony is also likely to amount to an improper narrative or opinion regarding the law enforcement response or defendant's claimed reasons for past conduct. Lay witnesses are permitted to testify to facts that are rationally based on their first-hand observations. Fed. R. Evid. 602. Kelley's testimony will invariably include statements that include his legal opinions about aspects of the case. This would amount to improperly noticed expert testimony. *See* Fed. R. Evid. 702.

The proposed hearsay also risks confusing the issues by inviting the jury to equate physical dangerousness with the seriousness of the charged threats. Whether the defendant or others believed he was likely to carry out violence does not determine whether the manuscript conveyed a serious expression of an intent to commit unlawful violence. Those are distinct questions, and only the latter, together with whether Ivers consciously disregarded the risk that his communications would be understood as threatening, is before

18

the jury. Admitting the testimony would improperly collapse those inquiries and substitute collateral hearsay and irrelevant opinion for the jury's own assessment of the charged communications.

## **CONCLUSION**

The government respectfully requests the Court enter Orders consistent with the requests herein.

Dated: July 28, 2026

Respectfully Submitted,

DANIEL N. ROSEN
United States Attorney

*/s/ William C. Mattessich*
BY: BRADLEY M. ENDICOTT
WILLIAM C. MATTESSICH
Assistant United States Attorneys